IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FLEMING FITZGERALD & ASSOCIATES      )
LIMITED, FISH AND GAME FRONTIERS,    )
INC. d/b/a FRONTIERS INTERNATIONAL,  )
INC., PONOI RIVER COMPANY and        )
SHACKLETON INTERNATIONAL LIMITED     )
          Plaintiffs,                )
                                     )
     v.                              )    Civil Action No.  07-1596
                                     )
U.S. SPECIALTY INSURANCE COMPANY,    )
          Defendant and Third-       )
          Party Plaintiff,           )
                                     )
     v.                              )
                                     )
ZURICH AMERICAN INSURANCE COMPANY    )
and STEADFAST INSURANCE COMPANY      )
          Third-Party Defendants.    )
                                     )

MEMORANDUM and ORDER

Gary L. Lancaster,
District Judge.                                    September 30, 2008

This is an insurance coverage case. Plaintiffs, Fleming
Fitzgerald & Associates Limited, Fish and Game Frontiers, Inc.
d/b/a Frontiers International, Inc., Ponoi River Company, and
Shackleton International Limited (collectively, "the insureds")
purchased a Directors, Officers, and Organization Liability
Insurance Policy from defendant U.S. Specialty Insurance Company
("the insurer"). The insureds sought insurance coverage under the
policy for defense costs incurred in an underlying Tennessee state
court lawsuit. The insurer denied the insureds' claim for
insurance coverage on the basis that the claims against the
insureds were excluded from coverage.

The insureds then filed this suit in state court. The insureds allege claims for breach of contract (Count I), Pennsylvania statutory bad faith pursuant to 42 Pa. Cons. Stat. Ann. § 8371 (Count II), and common law bad faith (Count III) [doc. no. 33]. The insurer removed the case to this court based upon diversity jurisdiction under 28 U.S.C. § 1332 [doc. no. 1]. Thereafter, the insurer filed a counter-claim against the insureds seeking a judgment that the subject policy does not afford coverage for the Tennessee action [doc. no. 35].[1]

At a status conference on January 26, 2008, the court stayed discovery and instructed the parties to file cross-motions for summary judgment as to the threshold issue of whether the claims alleged in the underlying Tennessee lawsuit are covered under the policy [doc. no 32]. The insureds have, therefore, filed a motion for partial summary judgment [doc. no. 39]. The insureds argue that, with the exception of the underlying breach of contract claim, all of the claims alleged in the Tennessee state court action are covered by the policy. The insurer has also filed a motion for summary judgment [doc. no. 51]. The insurer argues that none of the claims alleged against the insureds in the Tennessee

---

[1] The insurer also filed a third-party complaint against third-party defendants Zurich American Insurance Company and Steadfast Insurance Company alleging, inter alia, that the professional liability policies issued by them to the insureds are the primary and only insurance policies which cover the Tennessee claims against the insureds [doc. no. 10].

state court action are covered under the policy.[2]

For the reasons set forth below, the court finds that
with the exception of the underlying breach of contract claim
against the insureds, the claims alleged in the Tennessee state
court action are covered by the policy. The insureds' motion for
partial summary judgment [doc. no 39] will, therefore, be granted
and insurer's motion [doc. no. 51] will be granted in part and
denied in part.[3]

I.    BACKGROUND

While the parties do not characterize the underlying
claims in the same manner, they agree that the facts of this case
are undisputed.

A.    The Policy

As mentioned above, the insureds purchased a "Directors,
Officers and Organization Liability Insurance Policy" ("the

_____

2

The insureds breach of contract claim (Count I) is based upon the
allegation that the insurer breached the terms of the policy when
it denied coverage for the Tennessee state court claims. As such,
liability for the insureds' breach of contract claim parallels the
coverage issue raised in the parties' summary judgment motions.
Likewise, the insurer's counter-claim parallels the coverage issue.
The parties' respective summary judgment motions, therefore, also
seek judgment as to: (1) liability for the insureds' breach of
contract claim (Count I), and (2) the insurer's counter-claim.

3

The coverage afforded by the policies issued by the third-party
defendants to the insureds is not addressed in the these cross-
motions for summary judgment and will not be discussed in this
opinion.

3

policy") issued by the insurer. The policy provides coverage for loss arising from claims for wrongful acts made during the policy period January 23, 2007 through January 23, 2008. The policy defines "loss" as follows:

> **Loss** means **Defense Costs** and any damages, settlements, judgments, back pay awards and front pay awards or other amounts ... that the **Insured** is legally obligated to pay as a result of any **Claim**; ... . (Emphasis in original).

[Doc. No. 42-2, at 4 of 17]. "Defense costs" are defined as "reasonable legal fees, costs, and expenses consented to by the Insurer ... resulting from the investigation, adjustment, defense or appeal of a Claim against an Insured,..." Id. at 3 of 17.

A "claim" is defined in the policy as follows:

DEFINITIONS

(B) Claim means:

    (1) any oral or written demand, including any demand for non-monetary relief,

    (2) any civil proceeding commenced by service of a complaint or similar pleading,

    (3) any arbitration, mediation or other similar dispute resolution proceeding,

    (4) any administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document,

    (5) any criminal proceeding commenced by the return of an indictment, or

    (6) any appeal from any proceeding referred to in this DEFINITION (B).

<u>Id</u>. at 2 of 17.

The policy obligates the insurer to reimburse the insureds for their "covered" defense costs on an "as-incurred basis." If, however, it is later determined that any defense costs are not covered, the insureds are obligated to repay the non-covered costs to the insurer. Condition (D)(2) of the policy states:

> The Insurer will pay covered **Defense Costs** on an as-incurred basis. If it is finally determined that any **Defense Costs** paid by the Insurer are not covered under this policy, the **Insureds** agree to repay such non-covered **Defense Costs** to the Insurer. (Emphasis in original).

<u>Id</u>. at 12 of 17. When the insureds incur legal fees in connection with a claim that includes both covered and uncovered defense costs, the policy requires the insureds and the insurer to use their "best efforts" to allocate which costs relate to covered claims and which costs relate to uncovered claims. Condition (D)(3) of the policy states in relevant part:

> If **Loss** covered by this Policy and loss not covered by this Policy are both incurred in connection with a single **Claim**, ... because the **Claim** includes both covered and uncovered matters ... , the **Insureds** and the Insurer agree to use their best efforts to determine a fair and proper allocation of all such amounts, taking into account the relative legal and financial exposures of the parties to the **Claim** and the relative benefits to be obtained by the resolution of the **Claim**. The Insurer will be

5

> obligated to pay only those amounts or
> portions of **Loss** allocated to covered
> matters claimed against **Insureds**. If the
> **Insureds** and the Insurer are unable to
> agree upon an allocation, then until a
> final allocation is agreed upon or
> determined pursuant to the provisions of
> this Policy and applicable law, the
> Insurer will be obligated to make interim
> payment of that amount or portion of
> **Loss**, including **Defense Costs**, which the
> parties agree is not in dispute.
> (Emphasis in original).

<u>Id</u>. at 12 of 17.

While the insurer must reimburse the insureds for covered
defense costs, the policy plainly states, in bold, that "THE
INSURER HAS NO DUTY UNDER THE POLICY TO DEFEND ANY INSURED." <u>Id</u>.
at 1 of 17. The policy further states that it is the insureds who
must defend any claim against themselves:

> The Insurer will have no duty under this
> Policy to defend any Claim. The Insureds must
> defend any claim against them.

<u>Id</u>. at 12 of 17.

The policy contains multiple exclusions. Two exclusions
are at issue here: (1) the breach of contract exclusion; and (2)
the errors and omissions exclusion. The breach of contract
exclusion states in pertinent part:

> ... the Insurer will not be liable to make any
> payment of **Loss** in connection with a **Claim**:
>
> (P) for any actual or alleged breach of
> contract or agreement;... . (Emphasis in
> original).

6

Id. at 6, 9 of 17. The errors and omissions exclusion states:

> No coverage will be available under this
> Policy for **Loss**, including **Defense Costs**, from
> **Claims** for any actual or alleged act, error,
> omission, misstatement, misleading statement
> or breach of duty in connection with the
> rendering of, or actual or alleged failure to
> render, any services for others for a fee or
> commission or on any other compensated basis
> by any person or entity otherwise entitled to
> coverage under this Policy. (Emphasis in
> original).

Id., Endorsement No. 6.

### B. The Tennessee Lawsuit

In April of 2007, during the policy period, the insureds
sought coverage under the policy for defense costs incurred
responding to a lawsuit filed against them on April 9, 2007, in
Tennessee state court captioned, L. Hardwick Caldwell, III et al.
v. Ponoi River Co., et. al., Chancery Court of Hamilton County,
Tennessee, No. 07-0326 ("Caldwell action"). The Caldwell action
was brought by seventeen individuals who owned exclusive fishing
rights to the Ponoi River in Murmansk, Russia.

### 1. Caldwell Factual Allegations

Below, we summarize the pertinent allegations of the
Caldwell complaint as follows:

The Ponoi River is home to arguably the finest Atlantic
salmon fishing in the world. The salmon fishing at this location
is a one-of-a-kind experience that attracts enthusiasts from the
world over who are willing to pay tens of thousands of dollars for

7

the privilege of fishing there.

In 1993, the Ponoi River Company (hereinafter "PRC") was formed to acquire fishing rights to the Ponoi River and the fishing camp at Ryabaga (the "Ryabaga Camp"). PRC held the exclusive fishing rights through its Russian subsidiary, ZAO, a local Russian company. PRC is the owner of all interests of every nature of ZAO. In the 1990's, Russian authorities granted ZAO exclusive fishing rights to the Ponoi River and the exclusive right to occupy and operate the Ryabaga Camp.

In order to facilitate travel arrangements for fly fishermen planning to visit the Ponoi River, PRC retained Frontiers as the exclusive sales, marketing, and booking agent for PRC and its Ryabaga Camp operation. As PRC's agent, Frontiers ran the day-to-day operations of the Ryabaga Camp. PRC operated its Ponoi River fishing business on a fee basis to open to 16 to 20 fishermen per week. All bookings and logistics were coordinated by Frontiers, which received a significant percentage commission on each individual booking.

In 1996, PRC, in an effort to enhance the exclusivity of the Ponoi River, decided to allow two small fishing clubs (called "syndicates") to acquire the exclusive fishing rights on the Ponoi River during the month of September on a permanent basis. "The original members of the two syndicates - called 'Ponoi River Salmon Club (Fall I)' and 'Ponoi River Salmon Club (Fall II)' - paid

8

$40,000 each, 'for which the club member receive[d] one week's fishing rights identical to those currently under lease by [PRC] in perpetuity for as long as these rights are held." [Doc. No. 42-3 at ¶47].

Each Caldwell plaintiff is a member of one of the two syndicates. "A central feature of the syndicate membership agreement is the 'Fishing Contract' between PRC and the syndicate members, which assigns to the respective syndicate members the fishing rights (a 'rod') on the Ponoi River for one week in September of each year." Id. at ¶52. According to the Caldwell plaintiffs, these rights were intended to be perpetual and to remain valid regardless of the ownership of PRC or ZAO.

From 1997 through 2001, the Ponoi River's stature in fly fishing circles continued to grow, along with the desirability of joining one of the exclusive syndicates. By 1999, only three years after the syndicates were formed, the going price of a rod had increased to $50,000.

"PRC required syndicate members to book their trips to the Ponoi River through Frontiers, but the members received a 50 percent discount on the fee which would otherwise be charged for that week." Id. at ¶58. "This arrangement significantly reduced the commissions payable to Frontiers since Frontiers' commission for the syndicate weeks was a percentage of the discounted rate and because there were fewer fishermen at the Ryabaga Camp during those

9

two weeks." Id. at ¶59. "At all times relevant, Frontiers was aware of and recognized the syndicate members' exclusive rights to the Ponoi River for their respective September weeks, and served as the primary contact and agent for syndicate members for issues involving the use of rods [f]or the Ryabaga Camp." Id. at ¶60.

On January 24, 2000, PRC, ZAO, and Russian authorities entered into an agreement which extended PRC's and ZAO's exclusive rights to the Ponoi River through 2014. Further extensions of these rights were desired and anticipated.

On February 15, 2002, Shackleton, the owner of several premier international fishing properties, purchased all capital stock of PRC pursuant to a Sales and Purchase Agreement. Shackleton acquired all of PRC's contractual rights, obligations, and liabilities, including the Ponoi River fishing rights. The Sales and Purchase Agreement, signed by officers of Shackleton, Frontiers, and PRC, expressly acknowledged the Caldwell plaintiffs' rights:

> Provisions of [§ 2.10(a)] notwithstanding, Buyer shall acquire the Business subject to certain current fishing syndicate members continuing to have fishing rights in two specified September fishing syndicate weeks, in the manner described on the attached Schedule 2.10(c), for so long as the syndicate members obey such reasonable rules as Buyer may from time to time employ, and for so long as Buyer shall have the applicable rights under the Leases, and for so long as the syndicate members pay the fees and charges applicable to such weeks, as such fees may change from time to time.

10

<u>Id</u>. at ¶67, quoting Sales and Purchase Agreement. The Sales and Purchase Agreement listed the specific weeks through 2010 which were reserved to the syndicates. "Particular dates in the prime season after 2010 were to be agreed upon consistent with 'the manner described' in Schedule 2.10(c)." <u>Id</u>. at ¶68.

"The Sales and Purchase Agreement also provided that the syndicate members would be permitted to use the 'same water' at the Ryabaga Camp during their respective weeks, and that the logistical arrangements, services, pricing structure, and payment schedule 'offered to the syndicate members previously' would continue to be honored." <u>Id</u>. at ¶69. "Further, the Sales and Purchase Agreement provided that the visa and customer services provided by Frontiers would be available to syndicate members after the sale to Shackleton 'as long as Frontiers is involved.'" <u>Id</u>. at ¶70.

The <u>Caldwell</u> plaintiffs allege that since the fishing rights for the syndicates' September weeks were irreversibly assigned to the syndicates, Shackleton did not acquire the fishing rights for those particular weeks when it purchased PRC and ZAO. After Shackleton's purchase of PRC, the syndicate members exercised their fishing rights to the Ponoi River on the same terms and to the same extent as they had prior to the purchase.

In 2003, Shackleton and Frontiers combined their operations and formed Fleming Fitzgerald. In late 2003, a dispute developed between the <u>Caldwell</u> plaintiffs and Fleming Fitzgerald

11

when Shackleton attempted to change the weeks and fee structure to which the syndicates had long held the rights under what was commonly called the "syndicate agreement." The reason for the proposed increase in the fee structure was that "[Frontiers], Shackleton, and the Ponoi River Company were losing money operating the two September syndicate weeks." During the non-syndicate weeks, Frontiers received its 15 percent commission on the full weekly rate, which in 2005 ranged from $4,950 to $9,950 per rod for up to twenty rods per week, a total potential commission of nearly $30,000. During syndicate weeks, Frontiers received its 15 percent commission on only half the market weekly rate and for only ten or twelve rods per week, a total potential weekly commission of only about $9,000. Therefore, Shackleton, Frontiers, PRC, and Fleming Fitzgerald had a financial incentive to illegally eliminate the syndicate agreements.

The dispute was resolved in early 2004 with the syndicates receiving written assurances from Fleming Fitzgerald, Shackleton, Frontiers, and PRC that their fishing rights would be honored as provided for in the Sales and Purchase Agreement. "At the same time, Fleming Fitzgerald, Shackleton, Frontiers, and PRC acknowledged that the syndicates' rights extend beyond 2010, and specifically represented that the syndicates would be consulted prior to any action which could affect the syndicates' reserved September weeks beyond that time." Id. at ¶80.

In its President's Report for 2006, PRC reported that it had been sold to a Russian citizen, Ilya Sherbovich ("Mr. Sherbovich"). In a September 21, 2006 letter enclosing the report, PRC, Fleming Fitzgerald, and Shackleton, collectively, stated that Shackleton had sold PRC's assets - namely ZAO - to Mr. Sherbovich, and that, despite a decade of PRC and ZAO acknowledging the syndicates' ownership of the prime weeks, "the concept of the syndicates can no longer be sustained." Id. at ¶86. The syndicate members were informed that, contrary to prior agreement, the only way to retain their rods was to accept certain new terms, including increasing the number of rods per week to twenty and requiring each syndicate member to pay the full market rate for their week, which in 2007 was $11,165 per rod. The Caldwell defendants began to market the Caldwell plaintiffs' syndicate weeks as twenty-rod weeks for $11,165 per rod.

According to the Caldwell plaintiffs, Mr. Sherbovich asserted that at the time of his purchase from Shackleton, Frontiers falsely represented to Mr. Sherbovich that the fishing rights to the Ponoi River were not encumbered by any claim or liability. Mr. Sherbovich refused to recognize the syndicates' fishing rights, and stated that if the syndicates did not acquiesce to his unilaterally and illegally imposed demands, "the September weeks will be sold at market rates." Id. at ¶94.

On March 2, 2007, one of the syndicates sent a check to

Frontiers in the amount of $66,990, representing the syndicate's contract rate, in order to reserve its September week. Nevertheless, Frontiers began marketing what it called a "unique opportunity ... to fish two prime September weeks on the Ponoi River," which "[f]or the last decade ... have been fished privately by a select group of rods who have decided not to return for this year." Id. at ¶97. On March 30, 2007, Frontiers, describing itself as the "global agent for New Fishing and Hunting," returned the syndicate's check. Id. at ¶98.

### 2. Caldwell Causes Of Action

Based upon the aforementioned allegations, the Caldwell complaint asserted thirteen causes of action against the insureds. Count I was a civil conspiracy claim against all of the insureds based upon the insureds conspiring "to unlawfully misappropriate Plaintiffs' fishing rights to the Ponoi River by 'selling' those rights to [New Fishing and Hunting]" (hereinafter "NFH"). [Doc. No. 42-3, at ¶101]. Count II was a Tennessee Consumer Protection Act claim, Tenn. Code Ann. §§ 47-18-103(2)(9), based upon the insureds engaging in "unfair and deceptive acts and practices affecting the conduct of trade and commerce in the State of Tennessee." Id. at ¶109.

Count III was a breach of contract claim against PRC and ZAO. Count III alleged that "PRC and ZAO agreed to honor Plaintiffs' rights to the Ponoi River for two specified September

weeks, ... ."  The Caldwell plaintiffs further alleged that the "sale of ZAO to NFH in disregard of Plaintiffs' fishing rights constitutes a breach of contract, as does the failure to provide Plaintiffs access to the Ryabaga Camp on the agreed terms and conditions."  Id. at ¶114.

Count IV asserted estoppel based upon irrevocable license against all of the insureds.  In support of this claim, the Caldwell plaintiffs alleged that "the grant to Plaintiffs of exclusive fishing rights to the Ponoi River for two prime weeks in September each year constitutes a license to enter upon and use the property of Defendants" and that "as a result of Plaintiffs' good-faith reliance, Defendants are estopped to revoke the license."  Id. at ¶¶118-119.

Count V was a common law claim of procurement of breach of contract against Fleming Fitzgerald, Shackleton, Frontiers, and NFH.  In support of this claim, the Caldwell complaint alleged that "the assignment by PRC and ZAO of exclusive fishing rights to the Ponoi River for two specified September weeks to Plaintiffs is a valid and binding contract between Plaintiffs and PRC and ZAO" and that "Fleming Fitzgerald, Shackleton, and Frontiers, individually and collectively, intended to bring about or cause the contract between Plaintiffs and PRC and ZAO to be breached."  Id. at ¶¶ 123, 125.  Count VI was a statutory claim of procurement of breach of contract against Fleming Fitzgerald, Shackleton, Frontiers and NFH.

Again, the Caldwell plaintiffs alleged that "the assignment by PRC and ZAO of exclusive fishing rights to the Ponoi River for two specified September weeks to Plaintiffs is a valid and binding contract between Plaintiffs and PRC and ZAO" and that "Fleming Fitzgerald, Shackleton, and Frontiers, individually and collectively, intended to bring about or cause the contract between Plaintiffs and PRC and ZAO to be breached" in violation of Tenn. Code Ann. § 47-50-109. Id. at ¶¶ 132, 134, 139.

Count VII was a claim for tortious interference with a business relationship against Fleming Fitzgerald, Shackleton, Frontiers, and NFH. In support of this claim, the Caldwell complaint asserted that "Fleming Fitzgerald, Shackleton, Frontiers, and NFH, individually and collectively, intended to bring about or cause the business relationship between Plaintiffs and PRC and ZAO to be breached or terminated." Id. at ¶143. Count VIII was a tortious interference with a business relationship claim against Fleming Fitzgerald, Shackleton, and NFH. In support of this claim, the Caldwell complaint asserted that "Fleming Fitzgerald, Shackleton, and NFH, individually and collectively, intended to bring about or cause the business relationship between Plaintiffs and Frontiers to be breached or terminated." Id. at ¶151.

Count IX was a breach of fiduciary duty claim against Fleming Fitzgerald, Shackleton, Frontiers, PRC and ZAO. In support of this claim, the Caldwell complaint asserted that "instead of

16

representing Plaintiffs' interests and keeping Plaintiffs fully informed, these Defendants breached their fiduciary duty by secretly, wrongfully, and with self-interest entering into an agreement to sell ZAO to NFH in disregard of Plaintiffs' exclusive fishing rights." Id. at ¶160. Count X was breach of agency relationship claim against Fleming Fitzgerald, Shackleton, Frontiers, PRC and ZAO. In support of this claim, the Caldwell complaint asserted that "instead of representing Plaintiffs' interests and keeping Plaintiffs fully informed, these Defendants breached their agency relationship by secretly, wrongfully, and with self-interest entering into an agreement to sell ZAO to NFH in disregard of Plaintiffs' exclusive fishing rights." Id. at ¶167.

Count XI alleged a constructive trust claim against NFH. In support of this claim, the Caldwell complaint asserted that "NFH claims to have received Plaintiffs' exclusive fishing rights as a result of the breach of fiduciary and agency duties which Fleming Fitzgerald, Shackleton, Frontiers, PRC and ZAO owed to Plaintiffs" and that, consequently, "NFH holds Plaintiffs' rods as a constructive trustee." Id. at ¶¶ 172, 173.

Count XII asserted a claim for intentional misrepresentation against Fleming Fitzgerald, Shackleton, Frontiers, and PRC. In support of this claim, the Caldwell complaint asserted that "Fleming Fitzgerald, Shackleton, Frontiers, and PRC falsely represented that they would honor Plaintiffs'

17

rights" and "also falsely represented to NFH that the fishing rights to the Ponoi River were unencumbered by any claim or liability." Id. at ¶¶ 178, 179. Finally, Count XIII alleged negligent misrepresentation against Fleming Fitzgerald, Shackleton, Frontiers, and PRC. In support of this claim, the Caldwell complaint asserted that "Fleming Fitzgerald, Shackleton, Frontiers, and PRC falsely represented that they would honor Plaintiffs' rights." Id. at ¶ 187.[4]

C. The Insurer Denies Coverage Under The Policy

By letter dated June 29, 2007, the insurer denied coverage under the policy [doc. no. 42-7]. The insurer based its denial on the errors and omissions exclusion:

> [T]he Plaintiffs claim that the Insured failed to reserve the Plaintiffs' fishing rights. These alleged acts arise out of services that the Insured provides to customers for compensation. Therefore, there is no coverage available under the Policy for any aspect of this Claim.

Id.

The insureds responded, in a letter dated August 24, 2007, asking the insurer to reconsider its decision [doc. no. 42-8]. In their August 24, 2007 letter, the insureds set forth their position that the Caldwell action arises out of the insureds' alleged interference with the Caldwell plaintiffs' fishing rights

---

4

Count XIX seeks injunctive relief. [Doc. No. 42-3, at ¶¶ 193-196].

18

and is not a claim involving a failure to provide services. Id. Additionally, the insureds notified the insurer that they had already incurred in excess of $675,000 in attorney's fees and costs in defending the Caldwell action. Id. The insurer, however, refused to reconsider its coverage position.

On August 27, 2007, the insureds and the Caldwell plaintiffs settled the Caldwell action.

D.    The Parties Seek A Coverage Determination From This Court

The insureds filed this suit against the insurer in the Court of Common Pleas of Allegheny County, Pennsylvania, on November 19, 2007, alleging breach of contract, statutory bad faith pursuant to 42 Pa. Cons. Stat. Ann. § 8371 (2007), and common law bad faith [doc. nos. 1-3, 33]. The insurer removed the case to this court based upon diversity jurisdiction. Id. The insurer then filed a counterclaim against the insureds seeking, inter alia, a declaratory judgment that the policy does not afford the insureds coverage for the Caldwell action [doc. no. 35].

Currently before the court are the insureds' partial motion for summary judgment and the insurer's motion for summary judgment. The issue to be determined is which Caldwell claims, if any, are covered by the policy.

## II. STANDARD OF REVIEW

Fed.R.Civ.P. 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986) (internal quotation marks omitted). Similarly, summary judgment is improper so long as the dispute over the material facts is genuine. Id. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 248-49.

To demonstrate entitlement to summary judgment, defendants, as the moving parties, are not required to refute the essential elements of the plaintiff's cause of action. Defendants need only point out the absence or insufficiency of plaintiff's evidence offered in support of those essential elements. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

20

Once that burden has been met, plaintiff must identify affirmative evidence of record that supports each essential element of his cause of action. If plaintiff fails to provide such evidence, then he is not entitled to a trial, and defendants are entitled to summary judgment as a matter of law.

It is on this standard that the court has reviewed the instant motions for summary judgment and the responses thereto. Based on the pleadings and evidence of record, and the briefs filed in support and opposition thereto, the court concludes that only the Caldwell breach of contract claim is not covered by the policy. The remaining Caldwell claims are covered by the policy.

## III. DISCUSSION

Our primary task is to construe the insurance policy between the insureds and the insurer. The interpretation of an insurance policy is a question of law for the court. Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997); Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983). The parties contend, and the court agrees, that Pennsylvania law applies.[5]

---

[5]

Since jurisdiction in this case is predicated on diversity of citizenship under 28 U.S.C. § 1332(a)(1), the court must apply the choice of law rules applicable in the Commonwealth of Pennsylvania. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941). Pennsylvania conflict of laws principles dictate that an insurance contract is guided by the law of the state in which it was delivered. See Frog Switch & Mfg. Co., Inc. v. Travelers Ins. Co.,

21

Like any other contract, the language of an insurance policy is construed to give effect to the intention of the parties. See Riccio v. Am. Republic Ins. Co., 705 A.2d 422, 426 (Pa. 1997). "When the policy language is clear and unambiguous, the court must give effect to the language of the contract." Id. Words of common usage in an insurance policy are to be given their natural, plain and ordinary meaning. Id. at 425. Contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. Madison Const. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999). The court is not permitted to distort the meaning of the language or employ a strained contrivance in order to create an ambiguity. Id.

A.   Scope Of Coverage

The court's first step in an insurance coverage dispute is to determine the scope of the policy's coverage. General Accident Ins. Co. of Am. v. Allen, 692 A.2d 1089, 1095 (1997). The policy is not a duty to defend policy as it plainly and unambiguously states that the insurer owes no duty to defend.

The policy, also, is not a traditional indemnity policy. The "as-incurred" language of the policy does not fall within the duty to indemnify framework. Pennsylvania law regarding the duty to indemnify provides that "[a]n insurer is required to indemnify

_____

193 F.3d 742, 746 (3d Cir. 1999). Accordingly, because the policy was delivered to plaintiff Fleming Fitzgerald & Associates, Limited in Pennsylvania, Pennsylvania law applies.

only where the insured is held liable for a claim actually covered by the policy." USX Corp. v. Adriatic Ins. Co., 99 F.Supp.2d 593, 611 (W.D. Pa. 2000) (citing General Accident Ins. Co. of Am., 692 A.2d at 1095). The duty to indemnify does not arise until the liability imposed against the insured is "conclusively established." Id. at 612 (citations omitted).

The plain language of the policy, however, requires the insurer to reimburse the insureds before liability is conclusively established. The policy requires the insurer to pay the insureds' covered defense costs on an "as incurred" basis. Condition (D)(2) of the policy states:

> The Insurer will pay covered Defense Costs on **an as-incurred basis**. If it is **finally determined** that any Defense Costs paid by the Insurer **are not covered** under this policy, the Insureds agree to **repay** such non-covered Defense Costs to the Insurer. (Emphasis added).

[Doc. No. 42-2, 12 of 17]. The policy, therefore, requires immediate reimbursement of covered defense costs as they become due. The policy does not permit the insurer to initially deny coverage until a court or jury to determines which, if any, claims are covered, then use that adjudication to determine which defense costs are "covered" and which are "non-covered." Such an interpretation would obviate the "as-incurred" language of the policy.

In fact, pursuant to Condition (D)(2), it is the insureds

23

who are permitted to wait until it is "finally determined" that any defense costs paid by the insurer are not covered under the policy and if they are obligated to re-pay any non-covered defense costs to the insurer. As such, once a final judgment found that any or all of the insureds' defense costs were not covered by the policy, then the insurer would be entitled to reimbursement for those non-covered costs. Therefore, as its title plainly indicates, the policy is a liability policy and not an indemnity policy. See Little v. MGIC Indem. Corp., 836 F.2d 789, 793 (3d Cir. 1987) (interpreting similar policy language).

However, because Condition (D)(2) only requires the insurer to pay for "covered" defense costs, the insurer is not obligated pay those that fall outside of coverage. Rather, the policy contemplates that the insurer will pay covered costs immediately, but not pay non-covered costs. The insurer must, therefore, make an initial determination as to what claims are covered and what claims are not covered. Condition (D)(2) requires the insurer to make an initial coverage determination, based on the allegations of the complaint, as to what defense costs are covered and to immediately begin paying those defense costs to the insureds. This interpretation avoids ambiguities and gives effect to all of the provisions in the policy. See Little, 836 F.2d at 793 ("If possible, a court should interpret the policy so as to avoid ambiguities and give effect to all of its provisions.")

24

B.    The Caldwell Action Falls Within The Policy's Coverage Provisions

The policy provides coverage for "loss" arising from "claims" made against the insureds during the "policy period" for "wrongful acts." [Doc. No. 42-2 at 2 of 17]. The policy defines "loss" as, _inter alia_, defense costs. Id. at 4 of 17. The policy defines "claims" as, _inter alia_, any civil proceeding commenced by service of a complaint. Id. at 2 of 17. The policy defines "wrongful acts" as any "alleged act, error, misstatement, misleading statement, omission or breach of duty ... by the insured organization ... or by an insured person." Id. at 6 of 17. There is no dispute that the insureds have incurred defense costs for a civil proceeding commenced by service of a complaint; there is no dispute that the claim was commenced during the policy period and that it alleges misstatements, misleading statements, breaches of duty and the like; and there is no dispute that the insureds are "insureds" under the policy. As such, there is no dispute that the scope of the policy covers the Caldwell action.[6]

C.    Policy Exclusions

The policy, like most insurance policies, first defines coverage broadly and then carves out exceptions to this coverage.

---

[6]

Indeed, the insurer has not argued otherwise in its coverage denial letter or in its summary judgment papers. The insurer's basis for denying coverage is not that the Caldwell claims do not fall within the scope of coverage, but, rather, that the policy's exclusions apply.

Therefore, the next issue is whether any of the underlying claims are excluded under the policy. Under Pennsylvania law, coverage exclusions are interpreted narrowly against the insurer. Pecorara v. Erie Ins. Exchange, 596 A.2d 237, 239 (Pa. Super. 1991). The insurer bears the burden of proving that any exclusions or limitations on coverage apply. Koppers Co., Inc. v. Aetna Cas. and Sur. Co., 98 F.3d 1440, 1446 (3d Cir. 1996) (applying Pennsylvania law); Madison Const. Co., 735 A.2d at 106. The Insurer contends that two exclusions apply to the Caldwell action: (1) the breach of contract exclusion, and (2) the errors and omissions exclusion. We examine each of these exclusions in turn.

## 1. Breach Of Contract Exclusion

The insurer contends that coverage for the Caldwell action is precluded by Exclusion (P), the breach of contract exclusion. Exclusion (P) of the policy states:

EXCLUSIONS

Unless otherwise specifically stated or provided for in CONDITION (D)(2) or elsewhere in this Policy, the Insurer will not be liable to make any payment of Loss in connection with a Claim:

(P) for any actual or alleged breach of contract or agreement; provided that this EXCLUSION (P) will not apply to any claim for an Employment Practices Wrongful Act.

[Doc. No. 42-2, at 9 of 17].

The insureds concede that the Caldwell plaintiffs' breach of contract claim, Count III in the Caldwell complaint, is excluded

26

from coverage pursuant to Exclusion (P). The insurer, however, asserts that all of the Caldwell claims are based upon breaches of contract and are, therefore, excluded from coverage pursuant to Exclusion (P). The court disagrees.

As mentioned above, the plain language of the insurance contract controls. See Riccio, 705 A.2d at 425 (holding that words of common usage are to be given their natural, plain and ordinary meaning); Selko v. Home Ins. Co., 139 F.3d 146, 151 (3d Cir. 1998). Exclusion (P) clearly and specifically states that "a claim for actual or alleged breach of contract" is excluded from coverage. Exclusion (P) does not state, "for any claim arising out of breach of contract," or "for any claim related a to breach of contract." Notably, broader "arising out of" and "based upon" language is used in several other exclusions in the policy:

> (A) arising out of, based upon or attributable to the gaining by any Insured of any profit or advantage to which such Insured was not legally entitled; ... ;

> (B) arising out of, based upon or attributable to the commission by an Insured of any criminal or deliberately fraudulent or dishonest act; ... ;

> (H) arising out of, based upon or attributable to facts or circumstances alleged, or to the same or related Wrongful Acts alleged or contained, in any claim which has been reported, ... under any policy of which this Policy is a renewal or replacement or which it may succeed in time;

27

> (I) arising out of, based upon or
> attributable to any pending or prior
> litigation as of the inception date of
> this Policy, ...;

[Doc. No. 42-2, ps. 6-7 of 17]. As such, the policy itself strongly indicates that the use of narrow, specific language in Exclusion (P) was calculated and that the parties intended for Exclusion (P) to apply only to breach of contract claims. See Riccio, 705 A.2d at 426 (holding that "an insurance policy, like every other written contract, must be read in its entirety and the intent of the policy is gathered from consideration of the entire instrument.") Moreover, Pennsylvania law requires us to assume that the use of the more narrow language, "for actual or alleged breach of contract" was deliberate. See Steuart v. McChesney, 444 A.2d 659, 662 (Pa. 1982) ("Courts in interpreting a contract do not assume that its language was chosen carelessly") (citation omitted).

Interpreting this narrowly drafted exclusion against the insurer, and in favor of coverage, Exclusion (P) applies only to Count III from the Caldwell action as that is the only claim for actual or alleged breach of contract.[7]  None of the remaining Caldwell claims are breach of contract claims. Furthermore, even

---

[7]

"It is axiomatic that insurance coverage is determined by the allegations made in the complaint." Little v. MGIC Indem. Corp., 649 F.Supp. 1460, 1466 (W.D. Pa. 1986) (analyzing the insurer's obligations to reimburse defense costs under a Directors & Officers liability policy) aff'd Little v. MGIC Indem. Corp., 836 F.2d 789, 793 (3d Cir. 1987).

if there is some ambiguity as to the scope of Exclusion (P), the provision must be construed in favor of the insureds and against the insurer. <u>Riccio</u>, 705 A.2d at 426.

The insurer argues that under the gist of the action doctrine, all of the <u>Caldwell</u> claims sound in contract, not tort, and are, therefore, excluded from coverage pursuant to Exclusion (P). The gist of the action doctrine, however, does not apply to the specific circumstances of this coverage dispute. Based upon the law of Pennsylvania and the law of this Circuit, the gist of the action doctrine, the determination of whether a cause of action sounds in contract or tort, applies in insurance coverage cases when the breach of contract exclusion at issue broadly excludes contractually-based claims.[8]   <u>See</u>, <u>e.g.</u>, <u>Phico Ins. Co. v. Presbyterian Med. Services Corp.</u>, 663 A.2d 753, 756 (Pa. Super. 1995) (excluding coverage for "claims arising in connection with the breach of oral and written agreements"); <u>Nationwide Mut. Ins. Co. v. CPB Intern., Inc.</u>, 06-0363, 2007 WL 4198173, *8 (M.D. Pa.

---

[8]

We are aware of cases where the courts have applied the gist of the action doctrine to commercial general liability policies covering damages caused by an "occurrence."   <u>See</u>, <u>e.g.</u>, <u>Freestone v. New Enlgand Log Homes, Inc.</u>, 819 A.2d 550 (Pa. Super. 2003); <u>Redevelopment Auth. of Cambria County v. International Ins. Co.</u>, 685 A.2d 581 (Pa. Super. 1996); <u>Jerry Davis, Inc. v. Maryland Ins. Co.</u>, 38 F.Supp.2d 387, 391 (E.D. Pa. 1999) (citing <u>Redevelopment Auth. of Cambria County</u>, 685 A.2d 581). The courts apply the doctrine to determine, not whether exclusionary language applies, but whether the claims are, in the first instance, covered by the policy.   As we have determined that the policy covers the <u>Caldwell</u> claims and the issue is whether any exclusion applies, those cases do not apply here.

Nov. 26, 2007) (excluding coverage for "contractual liability");
Continental Cas. Co. v. County of Chester, 244 F.Supp.2d 403, 409
(E.D. Pa. 2003) (excluding coverage for "any 'claim' arising out of
a breach of contract, or out of liability assumed by an insured
under any contract or agreement").

The parties have failed to identify, and research has not
disclosed, a Pennsylvania or Court of Appeals for the Third Circuit
case where the gist of the action doctrine was applied to a
coverage dispute involving the specific, narrow exclusion we have
here. Therefore, the gist of the action doctrine does not apply.
Exclusion (P) applies only to the underlying breach of contract
claim, Count III of the Caldwell complaint.[9]

## 2. Errors And Omissions Exclusion

Defendant also contends that coverage for the Caldwell
action is precluded by the Errors and Omissions Exclusion. The
Errors and Omission Exclusion states:

---

[9]

On August 21, 2007, the Tennessee state court issued Findings of
Fact and Conclusions of Law ("Caldwell findings") resolving the
insureds' motions to dismiss the Caldwell complaint for lack of
personal jurisdiction, insufficient service of process, and forum
non-conveniens [doc. no. 35-3,4]. Even if we considered the
Caldwell findings, instead of the Caldwell complaint, to determine
coverage, the result would be the same. The Caldwell findings do
not indicate that any claim other than Count III is a claim for
breach of contract. Rather, the Caldwell findings explicitly hold
that the conspiracy (Count I), Tennessee Consumer Protection Act
(Count II), procurement of breach of contract (Counts V, VI), and
tortious interference (Counts VII, VIII) claims are tort causes of
action [Doc. No. 35-4 at ¶¶ 328-354].

30

> No coverage will be available under this
> Policy for Loss, including Defense Costs,
> from Claims for any actual or alleged
> act, error, omission, misstatement,
> misleading statement or breach of duty **in
> connection with the rendering of, or
> actual or alleged failure to render, any
> services** for others for a fee or
> commission or on any other compensated
> basis by any person or entity otherwise
> entitled to coverage under this Policy.
> (Emphasis added).

[Doc. No. 42-2, Endorsement Number 6]. The issue, then, is which,
if any, of the Caldwell claims are for any acts "in connection
with" the rendering of or failure to render "services."

"Services" is a word of common usage and is not defined
in the policy. The Court of Appeals for the Third Circuit has
opined that "[w]here critical terms are left undefined in a policy,
Pennsylvania case law instructs that words of common usage in an
insurance policy are to be construed in their natural, plain and
ordinary sense...and we may inform our understanding of these terms
by considering their dictionary definitions." Canal Ins. Co. v.
Underwriters at Lloyd's London, 435 F.3d 431, 435-36 (3d Cir. 2006)
(citation and internal quotation omitted). Merriam-Webster
Dictionary defines "services," a noun, in relevant part as: (1)
the occupation or function of serving; or (2) the work performed by
one that serves. Merriam-Webster, Inc., Merriam-Webster's
Collegiate Dictionary (Merriam-Webster, 11th Ed. 2003).

The term "services" is only used in two of the one
hundred ninety-six paragraphs of the Caldwell complaint:

31

> 69. The Sales and Purchase Agreement also
> provided that the syndicate members would be
> permitted to use the "same water" and the
> Ryabaga Camp during their respective weeks,
> and that the logistical arrangements,
> services, pricing structure, and payment
> schedule "offered to the syndicate members
> previously" would continue to be honored.
>
> 70. Further, the Sales and Purchase Agreement
> provided that the visa and customer services
> provided by Frontiers would be available to
> syndicate members after the sale to Shackleton
> "as long as Frontiers is involved."

[Doc. No. 42-3, ¶¶ 69, 70]. The "services" discussed in the

Caldwell complaint are the logistical services, including booking

arrangements, which Frontiers provided to the Caldwell plaintiffs.

While not actually including the term "services," the following

allegations of the Caldwell complaint relate or refer to these

"services" provided by Frontiers:

> 42. In order to facilitate travel
> arrangements for fly fishermen planning to
> visit the Ponoi River, PRC retained Frontiers,
> ... , as the exclusive sales, marketing, and
> booking agent for PRC and its Ryabaga Camp
> operation.
>
> 45. PRC operated its Ponoi River fishing
> business on a fee basis to open to 16 to 20
> fishermen per week, with all bookings and
> logistics coordinated by Frontiers, which
> received a significant percentage commission
> on each individual booking.
>
> 58. PRC required syndicate members to book
> their trips to the Ponoi River through
> Frontiers, but the members received a 50
> percent discount on the fee which would
> otherwise be charged for that week. Mr.
> Caldwell's syndicate paid its booking fee and

32

other syndicate payments to Frontiers from the syndicate's Hamilton County, Tennessee, bank account.

59. This arrangement significantly reduced the commissions payable to Frontiers since Frontiers' commission for the syndicate weeks was a percentage of the discounted rate and because there were fewer fishermen at the Ryabaga Camp during those two weeks.

60. At all times relevant, Frontiers was aware of and recognized the syndicate members' exclusive rights to the Ponoi River for their respective September weeks, and served as the primary contact and agent for syndicate members for issues involving the use of rods [f]or the Ryabaga Camp.

76. During the non-syndicate weeks, Frontiers received its 15 percent commission on the full weekly rate, which in 2005 ranged from $4,950 to $9,950 per rod for up to 20 rods per week, a total potential commission of nearly $30,000.

77. During syndicate weeks, Frontiers received its 15 percent commission on only half the market weekly rate and for only ten or 12 rods per week, a total potential weekly commission of only about $9,000.

96. On March 2, 2007, Mr. Caldwell's syndicate sent a check, drawn on his syndicate's Hamilton County, Tennessee bank account, in the amount of $66,990, representing the syndicate's contract rate, to Frontiers in order to reserve its September week.

98. On March 20, 2007, Frontiers, describing itself as "the global agent for New Fishing and Hunting," returned the check to Mr. Caldwell.

114. The sale of ZAO to NFH in disregard of Plaintiffs' fishing rights constitutes a breach of contract, as does the failure to

> provide Plaintiffs access to the Ryabaga Camp
> on the agreed terms and conditions.

> 149. Plaintiffs maintained a business
> relationship with Frontiers in connection with
> the syndicates' use of their exclusive fishing
> rights to the Ponoi River for two specified
> September weeks, whereby Plaintiffs received a
> 50 percent discount on the weekly rate charged
> to the general public by Frontiers for the
> logistical and other customer services offered
> by Frontiers in connection with the use of
> fishing rights to the Ponoi River and the
> Ryabaga Camp.

[Doc. No. 42-3]. There is no allegation that the other insureds,

Fleming Fitzgerald & Associates, PRC, or Shackelton rendered or

failed to render any services. As such, the "services" referenced

in the Caldwell complaint relate only to the logistical and payment

services provided by Frontiers.

Clearly, Frontiers' rendering of, or failure to render,

services is tangential to the Caldwell action. The Caldwell claims

are not based upon a failure by Frontiers to provide services.

Indeed, none of the Caldwell claims allege a deprivation of

services. The Caldwell action is about the sale of fishing rights;

the Caldwell action is based upon the allegation that Shackleton's

sale of PRC interfered with the Caldwell plaintiffs' fishing rights

and that the insureds had made misrepresentations to the Caldwell

plaintiffs in connection with that transaction.

While the Caldwell complaint barely and infrequently

mentions the services provided by Frontiers, it repeatedly refers

to the Caldwell plaintiffs' fishing rights, the insureds' alleged

misappropriation and/or sale of the Caldwell plaintiffs' fishing rights, and the alleged misrepresentations made by the insureds to the Caldwell plaintiffs regarding the Caldwell plaintiffs' fishing rights. The allegations regarding Frontiers' services and the acts related to these services are mere factual background. See Niagra Fire Ins. Co. v. Pepicelli, Pepicelli, Watts and Youngs, P.C., 821 F.2d 216, 220 (3d Cir. 1987) ("The exclusions speak of excluded claims, and thus the character of the specific legal claims, rather than the malpractice suit's general factual background, must be analyzed to determine the exclusion issue.") None of the Caldwell claims are for any acts "in connection with" the rendering of or failure to render "services."[10] Therefore, the Errors and Omissions Exclusion has no application here.

---

[10]

Again, even if we looked to the Caldwell findings to determine coverage, the result would be the same. The Caldwell findings do not discuss the rendering of, or failure to render, logistical services, nor do they state that the Caldwell plaintiffs filed any claim for the deprivation of services. Rather, the Caldwell findings repeatedly state that the Caldwell action is based upon the insureds' interference with the Caldwell plaintiffs' fishing rights:

> The subject matter of this litigation involves, among other things, Plaintiffs' rights to fish the Ponoi River, the representations made by Defendants in connection with Plaintiffs' rights, and the contractual relationships between Plaintiffs and Defendants, and Defendants' orchestration of transactions to deprive Plaintiffs of their syndicate fishing rights.

[Doc. No. 35-4, at ¶¶ 239, 256; see also ¶¶ 273, 284].

35

IV. CONCLUSION

For the foregoing reasons, only the Caldwell breach of
contract claim, Count III of the Caldwell complaint, is excluded
from coverage under the policy. The remaining Caldwell causes of
action are covered by the insureds' policy. The insureds' motion
for partial summary judgment [doc. no. 39] will, therefore, be
granted. The insurer's motion for summary judgment [doc. no. 51]
will be granted in part as to the Caldwell breach of contract
claim; the insurer's motion for summary judgment will be denied as
to the remaining Caldwell claims.

Resolution of the coverage issue in favor of the insureds
also: (1) resolves the issue of liability for the insureds' breach
of contract claim (Count I) in favor of the insureds and against
the insurer, and (2) resolves the insurer's counterclaim in favor
of the insureds and against the insurer. Judgment will, therefore,
be entered in favor of the insureds, and against the insurer, as to
liability for the insureds' breach of contract claim (Count I).
Issues relating to the insureds' damages and claims for bad faith
remain unresolved. The insurer's counterclaim against the insureds
will be dismissed.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FLEMING FITZGERALD & ASSOCIATES )
LIMITED, FISH AND GAME FRONTIERS, )
INC. D/b/a FRONTIERS INTERNATIONAL,)
INC., PONOI RIVER COMPANY and )
SHACKLETON INTERNATIONAL LIMITED )
        Plaintiffs, )
                           )
     v. )    Civil Action No.  07-1596
                           )
U.S. SPECIALTY INSURANCE COMPANY, )
        Defendant and Third- )
        Party Plaintiff, )
                           )
     v. )
                           )
ZURICH AMERICAN INSURANCE COMPANY )
and STEADFAST INSURANCE COMPANY )
        Third-Party Defendants. )
                           )

<u>ORDER</u>

AND NOW, this 30ᵗ day of September, 2008, upon
consideration of plaintiffs' motion for partial summary judgment
[doc. no. 39] and defendants' motion for summary judgment [doc. no.
51], IT IS HEREBY ORDERED THAT plaintiffs' motion for partial
summary judgment is GRANTED.

IT IS FURTHER ORDERED THAT defendant's motion for summary
judgment is GRANTED in part and DENIED in part. Defendant's motion
for summary judgment is granted only as to the <u>Caldwell</u> breach of
contract claim (Count III of the <u>Caldwell</u> action); the motion is
denied as to the remaining <u>Caldwell</u> claims.

IT IS FURTHER ORDERED THAT judgment is entered in favor
of plaintiffs, and against defendant, as to liability for

plaintiffs' breach of contract claim.

IT IS FURTHER ORDERED THAT defendant's counterclaim against plaintiffs is dismissed.

BY THE COURT:

_____, J.

2